1332 Box Spring v. Wrapmaster 2453, that's right. Yeah, could you loan him your copy? Do you have the appendix? I have portions of it, Your Honor. I don't understand this. I really don't. You're both supposed to come here with the documents. We're going to ask you questions about them. What it says on 2453 is, the purpose of this demonstration apparently was merely to show in a very general way how cockspring bands are applied to a pipeline. It doesn't say anything about testing durability. Well, that's correct. And that's what I said. It was just for showing how to apply the bands. Let me say it differently. It can't be a 102B bar unless the invention was ready for patenting, and it wasn't. It wasn't a completed invention until it was not an invention ready for patenting. What was it that was not complete? The two things. One, what they did was just demonstrate how easy it is to wrap. So they didn't even put it on a pipe that had corrosion on it. That's number one. They just sandblasted a pipe, got the enamel off of it. They noted in the record that was given to the examiner that it had no corrosion. And then number two, it was an invention that claimed the invention was repaired. And they said in their final report about that, that it's going to have to sit here for a few years and there's going to have to be further research and development and testing until we know that this is really a repair. Did that demonstration include all of the limitations of claim one? Well, that's my point, Your Honor, that there were two important limitations. One, a repair, and number two, surface corrosion defects. And so neither of those two things were there. Well, that seems like an argument that not that there was an experimental use. It sounds like an argument that there wasn't a sale of the complete invention. That is, a demonstration of the complete invention so that the on-sale bar, public use bar, wouldn't apply. And that's not a question of whether the invention was ready for patenting. It's a question of what the public use was. And it strikes me that what you're saying is that this particular pipe didn't have a gouge in it. It wasn't corroded. So it wasn't a demonstration of all aspects, all the limitations of the claim, right? That's correct, plus the fact that it was just... I submit it was experimental in the sense that just to show or to experiment how, can we wrap a pipe with a resin encased fiber, secure it, and walk away? But the claim had much more in it. There's no suggestion that there was any doubt about their ability to do that. There's no suggestion that the ability to wrap the pipe needed to be tested. That's true. The ability to wrap didn't need to be tested. The only thing that needed to be tested was whether those coils would hold after they walked away. And that wasn't part of this demonstration. That's correct, Your Honor. Whether or not they would hold was not part of the demonstration. Okay, so the question boils down to the question of whether this demonstration included all the claim limitations. And unfortunately, this issue really hasn't been briefed. There are various cases that suggest that maybe the limitations don't all have to be demonstrated if the limitations would be obvious, so on and so forth. But I understand your position anyway. Okay. I'm a little confused by something, and this relates to something you were just discussing with Judge Dyke. If the pipe wasn't corroded at all, if it was in perfectly good condition, what was to test? I mean, if you take a brand-new pipe and you wrap something around it, presumably the pipe is going to stay at least as sound as it was when it was in its original condition. What were you testing? That is an excellent point, Your Honor. There's two issues there, and one is if the pipe has been weakened by outside corrosion, then there could be an issue of testing there. And as you point out, that wasn't it. But there's another issue too. I mean, that's just one issue. And that wasn't tested. But the other issue is when you wrap this pipe with this resin encased fiber, there is a problem with it unsliding. And they had to have two things, the correct kind of surface and they had to have a correct kind of adhesion so that the layers of the coils would not unwrap. I understand. Let me ask you a question on another issue. In your response, now this is before the magistrate judge, you filed a response to the motion for summary judgment. I don't know that it's in the joint appendix, but it's June 14, 2007. Does that ring a bell? All right. Now this is, I think, about an eight-page response. Now in that response, you do not argue that the dependent claims were not rendered obvious. You focus on the limitations of Claim 1, as I understand it. Is that correct? I believe that's correct, Your Honor, yes. That being the case, why haven't you waived any argument with respect to the dependent claims? I don't know. I think that's probably a good argument. One other question. In your response to the false advertising issue, again, before the magistrate, you argued, I believe, that the two statements in question, one about the metallic mesh and the other about the diamond lock system, were misleading, which is a term of art in this area, particularly in the Fifth Circuit, where the difference between misleading and false has real consequences for your burden of proof. But it wasn't until you get to the district court that you say false as opposed to misleading. Why, with respect to that issue, have you not waived the argument that the statements were false? Because in the actual hearing, the transcript of which is part of the record on appeal. Hearing before the magistrate or hearing before the district judge? There was no hearing before the district judge. Okay, just hearing before the magistrate. Yes, Your Honor. She had a hearing in which she heard all the summary judgment motions. Okay. And I quit being so polite and was very direct and said, those are absolutely false statements. Do we have that transcript in the joint appendix? It is.  Well, you don't have the joint appendix. In that same hearing, I just want to point out one of my arguments as to why new evidence could be presented on appeal is that it was in that same hearing that lasted two and a half hours, that evidence of copying and evidence of commercial success was presented to the magistrate judge. It wasn't presented for the purpose of showing non-obviousness. It was presented for other purposes. But it was indeed in that same two and a half hour hearing. But what purposes was it presented? Well, one issue that was presented, we had a summary judgment of infringement pending. And so we argued they're copying, that they're infringing. And then the defendants had a motion for summary judgment of inability to prove damages, latches and inability to prove damages. And so we presented evidence of the commercial success and of damages in that same two and a half hour hearing. And that transcript was part of the record. I'm going to go back and ask you a question on the obviousness issue. And the magistrate judge really essentially focused on just one, essentially one aspect of claim one. Is it correct that you waived any issue with regard to whether all of the other limitations were met in the prior art? No, I'm not saying that. I'm saying that I haven't researched it. But I believe I agree with Judge Bryson that if I didn't argue the dependent claims are waived. Yeah, and I'm not talking about the dependent claims now. I'm talking about claim one, which has a number of elements to it and limitations to it. And I don't see that they're discussed at all in the magistrate judge's opinion. Most of them are not. And essentially, I want to know, was it conceded that the others were, in fact, described in the prior? I never conceded that. And my problem with her opinion is that she basically dismissed all of the limitations of claim one and just referred to it as a fabric and ignored. Not only did she misinterpret and ignore Judge Gilmour's order on what the ban should be, but she ignored all the other limitations of claim one. And that's why I listed those out in the brief. Were you – the one piece of prior art, which was the focus of this, was the 569 patent. Am I correct about that? Well, we argued several pieces of prior art, the Shaw, the Centenary, and then also – No, but my understanding was that the 569 patent included all of the claim limitations except the wrapping in an uncured state. I think that's the 524. Oh, 524. I had the wrong number. If you're talking about the Canadian folly patent, that was very carefully argued to the examiner and showed that the folly showed that you should wrap it, cure it, and then sand it down. I understand, but the question I'm asking, following up what Judge Patel was asking about, did the 524 patent include all the claim limitations except wrapping in an uncured state? I don't recall. I think that's true. I know that the defendants make that point in their brief that there was only one small step, but I don't recall if the other claim limitations – I don't know if folly's Canadian patent had the adhesive that was not – there was a claim limitation that – there's two parts to this. Well, put it this way. Did you argue that any limitation here was absent in the 524 patent except wrapping in an uncured state? I don't recall. Okay. Oh, save. Actually, you've exhausted your time, but we'll give you two minutes of rebuttal time because we asked you a lot of questions, so we'll give you an opportunity to come back. And along with that, if Thomas, we could give – let's see, that's Mr. Prickett? Yes, Your Honor. We'll give Mr. Prickett an extra four minutes, if you would, on the clock, if you can do that. Thank you, Your Honor. May it please the Court. I'd like to start out with the on-sale bar issue that the Court spent some time on with Mr. Headley. And I would refer the Court in the record to one of the documents that the district judge relied on – there are three – that the district judge relied on in her decision that there may have been a fact issue on experimentation. Why do you get around the fact that this demonstration didn't involve a corroded pipe? I was actually just about to answer that question. In one of those documents, the one that was late submitted, is the so-called 28-page report that Clockspring submitted. And on page A2403, it says specifically – this is describing the same installation – various forms of corrosion were evidenced, including oxidation, on the top of page 2407. Well, but was there any putting in of a soft and uncured substance in the spots that were corroded? Indeed, there was, Your Honor. And where's that? And that is in the same document. The adhesive material was placed on top of the pipe in the corroded areas before it was then wrapped. And I would say, Your Honor, that probably the most important thing is that below – Adhesive material, now. Yes. The trouble is we're using adhesive – throughout the prior art, the term adhesive materials is used in two different ways. One is the putty that goes into the divots, for lack of a better term. And the other is the adhesive material that is either brushed or sprayed onto the wrap. Correct. Now, is it clear from context – I'll take your word for it because I don't have it in front of me – is it clear from context that the adhesive material you're talking about now in that report was the soft putty-like filler material as opposed to simply a spray or a brushed-on adhesive of the sort that went onto the coiled wrap? Let me be precise. There were two different materials. There is the adhesive that Your Honor is referring to. Right. And then there is the putty material. Right. The epoxy splash zone compound. Right. Both of which were used in the 1989 demonstration. Okay. And where – can you put your finger on where in the joint appendix that is made clear? I would refer, Your Honor, to the key document in this case that was not submitted to the Patent Office, which is the GRA 94-0072, which begins at A1372 and proceeds to 1489. And I would refer the Court specifically to 1396, which describes the defect filler that was described in that document. I'm confused. I thought you said that 2407 shows that this particular pipe in the demonstration was corroded. It does, Your Honor. And that another page in that same report showed that the putty was applied to that area, right? We're talking about two different reports. Let me be clear. No, I understand they're two different reports. But where does this report on 2407 say that the pipe was corroded? 2403, Your Honor. I'm sorry. Where does it say that? Bottom of the page. Various forms of corrosion were evidenced, including oxidation. Okay. And where does it say that the putty was put in that area? I don't believe that document refers to the putty. But the other document, the GRI report, which describes the same demonstration. Where does the other document show that? That document at page, it's a lengthy document, but it's page 1396. What's that, volume two? Yes. Where does it say that? The 3.1.2 defect filler. What paragraph are we talking about? The paragraph beginning 3.1.2 defect filler. That first paragraph. 1392? 1396. Yeah. Okay. The critical component needed to complete the composite repair systems was a suitable material for filling areas of metal loss in the defective area around the pipe. That paragraph. And the next paragraph. And you understand this putty to be the filler material that's referred to in claim one? That's correct, Your Honor. Now, I would step back for a minute and say that it is clear that Clockspring, in the proceeding below, did not dispute that the 1989 demonstration was identical to the invention claimed in 307 patent. That was not disputed below. But even if they now said to be disputing it, these documents demonstrate that it was the same. Did you have an expert witness testify that the demonstration satisfied all the claim limitations? We did not, Your Honor. Why not? There was never any expert put forth by the plaintiff, and, therefore, we never had any rebuttal. Well, but you were moving for a summary judgment. Correct. We didn't think it was necessary. We felt that the evidence in the record already was more than clear and convincing. Was the same thing true on the obviousness question? You had no expert? That's correct, Your Honor. From our perspective, that's a question of law that there's no need for an expert on. Well, motivation to combine is not a question of law. It's a question of fact. And the problem is that there isn't any testimony here about motivation to combine the 524 patent with ramping in an uncured state. I think our position, Your Honor, is that it's more than just the 524 patent. There are about five or six different patents that all talk about. Yeah, but you have to combine these patents. The question is, was there a motivation to combine? And you don't have any testimony that there was a motivation to combine. You're asking us to read these patents and reach a conclusion about motivation to combine. In this instance, Your Honor, first of all, I don't think after KSR, there's a requirement that there's a specific motivation to combine. But even if KSR had not been decided and we were still under the old TSM test, if you look at this art, there are five or six specific examples, even some by the same inventor of the 307 patent, where they are using the putty filler material and wrapping it before it has cured. Even going back to 1960 in the Shaw patent. Go ahead. In the 1960 Shaw patent, we are talking about using a formable tacky material that is wrapped before it has cured so that it can be squeezed into the hole or defect in the pipe. But Shaw wasn't a patent about high-pressure pipeline, right? That's correct. And again, we're not talking about anticipation here. We're talking about obviousness. So it would be... That's the point. You're trying to combine references. And what you're asking us to do is to sit here on appeal as a trier of fact and reach a conclusion that it would have been obvious for someone to be motivated to combine these two references. And, you know, we're not experts in the field. And you're asking the magistrate judge or the district court or whoever is sitting to be your expert, essentially, and to make those inferences without any expert testimony. That is correct. However, I would submit to the court that the standard here is whether this court can come to a firm and definite conviction that the magistrate judge made an error in making this finding based upon this five or six examples. But based upon what? Firm and definite. Is this your clearly erroneous argument that you make in your brief, that that's clearly erroneous as the right standard for reviewing the summary judgment? For underlying factual determinations. No. Not on summary judgment. That's after a bench trial. But this is a summary judgment proceeding. We have to look for a disputed issue of material fact. It's an entirely clear error. It has nothing to do with the inquiry. I was puzzled that your references in your brief to clear error, because it is, to my knowledge, no place at all in summary judgment analysis. Am I missing something? Your Honor, I stand corrected. That is the standard on post-trial. For JMAL after a bench trial. Correct. Correct, Your Honor. In this instance, though, under KSR, we've got two alternatives, Your Honors. Either wrapping with cured or uncured filler. But we're not talking about a complicated issue here. It's not a complicated issue, but it's a fact issue. And there hasn't been a trial. And isn't it the case that a trier of fact looking at this could reach a conclusion that maybe there wasn't a motivation to combine these things? In this instance, Your Honor, no. I would say that that is not the likely or reasonable outcome. Why not? Because of the prior art and how clear it is. And there are so many examples of using filler in its uncured state and wrapping it to repair in the same field that it just wouldn't be reasonable for a trier of fact, which is why the magistrate judge came out the way she did. This was also before the patent examiner and would be in the prosecution history, correct? The same arguments that were made before the magistrate judge were made before the patent examiner, correct? Some of the same arguments were made before the patent examiner. Was that prosecution history looked at by the magistrate judge in deciding these issues, both on the public use and on the obviousness inquiry? It's clear from her decision that, yes, she did look at the prosecution history of the 377 patent. And where is that in the decision? If you look at her and I have pages 2352. Excuse me, Your Honor. It is beginning at 2346 through 2348 and continuing on to 2349 is the discussion of the exchange, the key exchange between the inventors and the patent examiner. Another point that I would say that was undisputed below is that the only novel aspect of the 307 patent, according to the inventors, was this step of wrapping while the filler was still uncured. And I think that's another reason why there really isn't a fact issue here. They conceded that is the only novel aspect to the 307 patent. When did they concede that? They conceded that by not arguing against it below. And if you go back to Mr. Schmidt's declaration to the patent office, one of the inventors, he basically says, in an effort to get the patent allowed, the only difference between this invention and the 524 Canadian patent is that in that patent the filler had cured and in this patent the filler is still uncured. That, combined with the other examples, even by the same inventors, where they had wrapped uncured filler, makes it unreasonable for any fact finder to say that this was not an obvious invention. It was not inventive. Under KSR, where you have two possible permutations to do this method, either wrapping with it cured or uncured, it is not a novel step. To say you can wrap it uncured, particularly here where you have so many examples of having done so in the same art beforehand. Going back to the 1960s. Chemical compatibility between the adhesive and the filler. That's one of the arguable novelties here. It may well be, but it's certainly not argued by Clockspring.  Plaintiff's objections to the magistrate's memorandum and recommendation to the district court. Right in the middle of the page. The 307 patent involved two novel, non-obvious advances over the prior art. A, the chemical compatibility between the filler material and the adhesive. That's what they say in the brief, but it wasn't argued. It wasn't argued before the magistrate judge. It was argued after the magistrate judge issued her decision. The magistrate acknowledges. You say it's waived. Correct. When it was raised before the district court, it was waived because it hadn't previously been waived. Correct. For which I guess we now have to look at the transcript of the hearing before the magistrate judge because none of this was raised in the plaintiff's objection to summary judgment before the magistrate judge. Presumably everything that was raised was raised in the hearing. Right? At least Mr. Headley is. If it was raised at the hearing, I don't recall that. But in the brief, certainly. Do we have the transcript of the entire hearing in this joint appendix? We do. Okay. Going back to the on-sale bar, which is an alternative basis to invalidate this patent, because there was no dispute below that the 89 demonstration and the 307 patent are the identical method, the trial judge, the district judge, the only basis on which she could deny summary judgment was to find a possible fact issue with respect to experimentation versus commercial use. And she cited three documents that she relies upon for that decision. And the first is the one that I mentioned at the very beginning, which is the so-called 28-page report. That document in and of itself demonstrates that this was a commercial demonstration and not a test. That document at 2391 states the purpose of the demonstration. Paragraph 4 is to make clock spring application process by experienced and inexperienced crews in a field environment available for observation by Panhandle Eastern representatives and guests. And I would submit to the court that if NCF is in a position to demonstrate this method to prospective customers, then it is in a position to patent this method. And that in and of itself demonstrates this was a commercial decision. That's not the question for experimental use. You can still be experimenting even though it's ready for patenting. Otherwise, you wouldn't need the experimental use doctrine. And what we've said in Honeywell and other cases is you can be, even though it's ready for patenting, you can still have an experimental use under certain circumstances if you're trying to test whether the invention would work for its intended purpose. That's correct, Your Honor. But in this instance, this record, this document shows that that was not what was happening here. They had a number of different prospective customers from a variety of different gas transmission companies. And it is clear from these documents that this was to basically look for prospective contracts from these individuals. They were demonstrating this method. They had non-NCF attendees of that demonstration do their own installation. So from this document, it's clear that it was not an experiment. And really, there's nothing in this document or anything that has been cited in the record that suggests it was an experiment. In fact, the other two documents that the district judge cited in her decision are two additional GRI reports, again, submitted after the magistrate judge's decision, which the court acknowledged was improper but went ahead and cited it. The first one is a 1998 GRI report, which it doesn't say anything about the nature of the 1989 installation. It only says that after nine years, some of the materials that were used in a variety of installations, including the Cuero, Texas one, held up well over time. There's nothing in that document that suggests either commercial or experimental nature of that demonstration. Is there anything in the record to indicate that following the Cuero, Texas events of 1989 that there was any commercial exploitation of the invention during the five or eight years after that? Well, I can cite you to the portion of Clock Springs Brief, which talks about the fact that they applied for a Department of Transportation waiver for use of that method about a month or two months after the Cuero, Texas demonstration. I can also point the court back to the 28-page document where a couple of comments by the attendees there were recorded. And one of those comments was, you know, this is a terrific product. If it does what it's supposed to do. It's a product which is not on the shelf, so to speak, for some time, I take it. Right. Do you have any indication in the record as to when this product first became available for purchase? Well, I think we need to distinguish between the product, which is the materials themselves and the method. When the method became available through Clock Springs sales, presumably of materials used in connection with the method. I regret, Your Honor, that we do not have. Let me ask you one other question because we're running short of time. Unless you had a follow-up on that. I didn't mean to cut you off. The only other point I would say is that another comment made by someone at the demonstration was, how can I get some of this product? But doesn't all of that add up to a trier of fact determining from all of these pieces of evidence that you referred to, statements, comments, et cetera, and having to make a factual determination as to whether or not this was truly experimental or whether it had gone beyond that stage and was a public use? I think that is correct. And the only way you can have summary judgment in that context is if there is overwhelming evidence on the one hand and really no disputed evidence on the other hand. There's nothing in any of the documents that Clock Springs has cited that proves or even suggests that this was an experimental use in 1989. And I think that's how the magistrate judge got comfortable that in fact this was a summary judgment issue that could be decided because there was no true fact issue. If I could ask one other question. There is a document in the record that I had a hard time figuring out what to do with, frankly. You make reference to it in your brief. It's at A1606 to 1608. The Battelle letter. Yes, Your Honor. Now this is a 1986 document. It looks as if it references each of the elements, the limitations of Claim 1 with at least gross. But it's a letter from one person to another. What use do you see that letter as being with respect to the question of prior art and whether, well, let me stop there. I suppose Your Honor is asking was it a publication? How should we use the letter? Is Your Honor asking was it a publication and therefore eligible to be used as prior art? It seems not to be a publication. Is that correct or are you arguing that it was? We are arguing that this document in its form was then later available in the industry. When? Sometime after the date of this document. Therefore it can't be regarded as a publication prior to the critical date, right? If it was published outside of the private communication between these two  But that's my question. I don't have a date, Your Honor, specifically when it was made available. We really can't make use of it then? I think you can and here's why. Because when we submitted it as part of our motion for summary judgment, they never disputed it in terms of being a reference that could be used. They simply attempted, like the GRI report that I mentioned earlier, they attempted to seek its exclusion on admissibility grounds. If you look at the magistrate's decision, you will see that she says notably they don't contest the substance of these documents. They seek to exclude them on admissibility grounds. And she correctly determined that they were admissible on hearsay exceptions. And so essentially it's another waiver argument.  They may be admissible, but your argument is they didn't contest its status as prior art. Correct. Exactly. Thank you, Your Honor. Thank you. Mr. Headley, I think we reserve two minutes for you for rebuttal. Thank you, Your Honor. Just two points. One, there were a lot of GRI reports. One short summary report was used extensively and now quoted by the defendants. That was a summary of a very long GRI report that was actually a detailed analysis of what happened in Quero. That report was submitted to the patent examiner, examined by the patent examiner, extensively argued by them, and submitted as part of the summary judgment record. And it was referenced at times, the defendants referenced it at times they referenced the summary. The lower numbers, the 1396, that's the summary. And around the 1396 page is that short document summary. The 2403, that's like a 60-page document that goes step by step, hour by hour. And as I point out in my brief, nowhere in that very thorough step-by-step description of what actually happened in Quero does it talk about any surface cavities or any filling material going in those surface cavities, which are two limitations of the independent claim. So where did all this come from, the 1396 material? You say that's just wrong or what? I'm sorry. I'm not saying it's wrong. What happened, they found some GRI report that I didn't know about, my client hadn't told me about, that was written sometime subsequent and was a summary of this other GRI report that was written at the time and was a much more thorough, long, lengthy report. And that's the same report that was part of the file history of the patent submitted to the examiner and argued to the examiner as to why the invention is patentable in light of that 102, possible 102B event. So I'm just saying that very thorough, long, descriptive thing didn't talk about any kind of surface cavities or filling material being put in the surface cavity. But did you argue that before the magistrate judged that that was a missing element in this demonstration? I did not argue it in the hearing. I did not argue it. If I did argue it, it was in the objections. And was that report before the magistrate judged? Yes. By virtue of being in the prosecution? Yes. She had had that. In fact, it may have been submitted by the defendants long before. It was part of the record. She did have that. But it was a voluminous record. I mean, the file history was three feet. But did you call attention to that report? I did not call attention to it to the magistrate. Do you agree that on 1396 it shows a corroded area being filled? I disputed that in some document filed with the magistrate. I know. In fact, I guess it may not have been with the magistrate. It was with this court. I said there's these fact issues as to what was actually shown. The way that's written, it's not clear whether that was a filler material and whether it was something that suffocated water. I can't remember right now. I don't have it in front of me. But there's some issue with that summary. It's not near as clear as the detailed analysis and step-by-step. I mean, the thorough one that was submitted to the patent office, it had timestamps. It said 1102 we did this, 1105 we did this. It was very thorough, not only in time but in actually what was done. That was a later summary, and it could have been incorrect. I'm sorry, were you done? I think the reason we didn't say anything about the Patel letter, as I recall, I don't have it in front of me, but I'm pretty sure that Patel letter makes it clear on the second page that that was dealing with split steel sleeves. Yes, true. But it certainly has the soft putty, which is installed in an uncured state, and then the sleeves are put on while it's still uncured. So that aspect, in other words, if you don't have Shaw, you've got the Patel letter. Do you think the Patel letter is prior art? And if not, why not? For the reasons this court has pointed out, we didn't give it thought for two reasons. One, it was inadmissible. We didn't know where it came from, where it came, when. We didn't know any of those things. And then secondly, split steel sleeves are so vastly different than a coiled band of resin case fibers. Okay. Thank you. Thank you. Thank both counsel. The case is submitted. All rise. Now the court is adjourned from day to day.